[No. F016957. Fifth Dist. Aug. 2, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
RUBEN CONTRERAS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III of Discussion.

**COUNSEL**

Patricia L. Reber, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Edgar A. Kerry and Louis M. Vasquez, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THAXTER, J.**—Following trial by jury, appellant Ruben Contreras was found guilty of first degree murder with special circumstances (murder

during commission of robbery), attempted murder, conspiracy to commit robbery and two counts of robbery. The jury also found that Contreras personally used a deadly and dangerous weapon, a knife, in committing the offenses, and that he personally inflicted great bodily injury on the victim of the attempted murder. The jury fixed the penalty for the murder at life without possibility of parole. Appellant was sentenced to that term and, in addition, to a consecutive life sentence with possible parole for the attempted murder, and a consecutive six-year term for the enhancements. Sentences for the remaining counts were stayed pursuant to Penal Code section 654.

On appeal, Contreras contends the court erred when it denied his pretrial motion to suppress evidence that the surviving victim identified him, claiming that the identification was tainted by impermissibly suggestive photographic procedures. He also complains that the trial court improperly limited his cross-examination of a prosecution witness. Finally, he asserts the trial court erred by not granting his motion for new trial based on alleged juror misconduct. We reject all claims of error and affirm.

FACTS

The following is an abbreviated statement of facts. Most of the facts are irrelevant to the issues raised on appeal.

On March 30, 1989, Alvaro Lopez and Guadalupe Sanchez agreed to assist Jose Casares in a cocaine sale. Casares was a known cocaine dealer. Lopez met Casares when the two were in jail together. Sanchez lived with Lopez and Lopez's sister, Hidalia Lopez, who was Sanchez's common law wife.

On March 30, Lopez and Sanchez drove Hidalia's car to Elvira Haro's residence. Haro was caring for Lopez's twins, one of whom was ill. Lopez needed money to buy medicine for the sick child. They left, intending to go to Lopez's uncle's house. On the way they met Casares. According to Lopez, Sanchez agreed to buy Casares three ounces of cocaine and deliver it to Casares's home. Lopez denied being a drug dealer, but the two men did purchase cocaine. Sanchez placed it under the seat of the car.

Between 6:30 and 7 p.m., Lopez and Sanchez arrived at Casares's residence. Casares and appellant got into the backseat of Hidalia's car. Sanchez was driving and Lopez was in the front passenger seat. The group drove to the location where Casares supposedly had a friend who wanted to buy drugs. The friend had company, however, and no sale was made. Then Casares told Sanchez to drive to an area on Avenue 328 near Road 127 where the group was to wait.

After the car stopped, Casares ordered Sanchez to give him the cocaine. Sanchez handed the cocaine to Casares in the backseat. Casares then shot Sanchez in the head at close range, killing him.

Casares yelled to appellant to cut Lopez's throat. A struggle ensued. Lopez was shot in the arm by Casares and stabbed numerous times by appellant. Lopez was able to exit the car but the attack continued. Lopez was stabbed approximately 14 times. Finally, Lopez fell on the ground near the back of the car. Casares fired at Lopez but missed. Casares and appellant then dumped Sanchez's body and drove off. Witnesses summoned help and Lopez miraculously survived. Those who witnessed the crime were unable to positively identify the assailants. They all agreed the assailants were young adult Mexican males, but their descriptions varied somewhat as to height, weight and build.

Lopez initially failed to identify his assailants. He was shown two photographic lineups, one including Casares's picture and one including appellant's, but made no identification. The investigating officer saw Lopez react to Casares's photo and told Lopez's wife that he thought Lopez was being untruthful in saying he did not recognize his assailants in the photographs. He also told her that two suspects were in custody. After speaking with his wife, while still hospitalized, Lopez picked Casares from a photo lineup but did not identify appellant. He also failed to identify appellant when shown a single photo of appellant by the deputy district attorney two days before the preliminary hearing. Lopez identified appellant at the preliminary hearing when appellant was sitting at counsel table next to Casares. At trial, Lopez said he was sure appellant was his assailant. Lopez admitted he lied when he first told officers he did not recognize Casares in the photo lineup. He said his motive in lying was his desire to "get revenge" once released from the hospital. He not only recognized Casares's picture, he knew him.

At trial, informant Gilbert Galaviz testified for the prosecution. Galaviz lived with Casares and appellant. He testified that on the night of March 30, 1989, appellant and Casares left with Lopez and Sanchez. Casares had a gun and appellant had a butcher knife. They returned later that night with blood on their clothes. Appellant told Galaviz he had "killed a pig." Appellant and Casares changed clothes and said they had to get "rid" of the clothes. The two then left.

On the morning of March 31, 1989, appellant returned to the residence and told Galaviz they had killed Sanchez and stabbed Lopez. Casares had a large amount of cocaine.

When Galaviz gave his initial report to police, he was under arrest for petty theft and had not appeared for sentencing on a burglary conviction. For

cooperating with police, Galaviz was released on his own recognizance, the petty theft charge was dropped, and he served a shorter sentence for the burglary. At the time of trial, Galaviz was serving a 25-year-to-life sentence for murder. Galaviz murdered his victim with a knife taken from the residence where he lived.

Appellant's fingerprints were found inside and on the outside of Hidalia's car. Lopez's and Casares's prints were also found in the car. Casares's prints contained blood; appellant's prints did not. Sanchez's prints were not found. When the identifications were first made, none of the usable prints lifted from the car were identified as Galaviz's even though comparisons were made. Later, two, possibly three, prints first classified as "unusable" were later determined "usable." These were not compared to Galaviz's prints.

### DEFENSE

Appellant testified on his own behalf. He admitted that he knew Casares and was living with him and Galaviz on March 30, 1989. He refused to testify about the events of that evening. The defense attempted to implicate Galaviz in the murder.

Mary Contreras, appellant's sister who also lived with appellant, testified she saw Galaviz the morning after the murders with a shirt and pants which appeared to have blood on them. She said Galaviz told her the clothes needed to be burned.

Lolly Lopez testified that Galaviz told her he was involved in the murder. Galaviz was dating Lolly's sister and Lolly's family did not like Galaviz. Lolly did not report the conversation to authorities. On rebuttal, Galaviz denied telling Lolly he was involved in the murder.

Appellant presented testimony that the fingerprints found in the car could have been placed there from outside the car. He also called an expert witness who testified concerning the ability of Lopez and the other eyewitnesses to remember what they saw.

### DISCUSSION

I. *Admission of the identification evidence did not violate appellant's due process rights.*

Appellant contends the pretrial identification procedures used by law enforcement were unduly suggestive and as a result, Lopez's in-court

identification of appellant should have been suppressed. Appellant argues the identification procedures were unduly suggestive in two ways. First, he contends that when Lopez failed to identify his assailants when first shown the "mug" showup in the hospital, Detective Morales, by his conduct and statements, impermissibly suggested to Lopez that his assailants were pictured in the photos presented. Second, appellant argues it was impermissibly suggestive to show Lopez a single photo of appellant shortly before the preliminary hearing. According to appellant, these suggestive procedures resulted in the in-court identification of appellant as the assailant.

A pretrial identification procedure violates a defendant's due process rights if it is so impermissibly suggestive that it creates a very substantial likelihood of irreparable misidentification. The defendant bears the burden of proving unfairness as a "demonstrable reality," not just speculation. (*Simmons* v. *United States* (1968) 390 U.S. 377, 384 [19 L.Ed.2d 1247, 1253, 88 S.Ct. 967]; *People* v. *Sanders* (1990) 51 Cal.3d 471, 508 [273 Cal.Rptr. 537, 797 P.2d 561]; *People* v. *Perkins* (1986) 184 Cal.App.3d 583, 589 [229 Cal.Rptr. 219].)

On review we must consider the totality of the circumstances to determine whether the identification procedure was unconstitutionally suggestive. We must resolve all evidentiary conflicts in favor of the trial court's findings and uphold them if supported by substantial evidence. (*People* v. *Wimberly* (1992) 5 Cal.App.4th 773, 788 [7 Cal.Rptr.2d 152].)

In denying appellant's motion to suppress evidence that Lopez identified appellant as his assailant, the trial court expressly rejected Lopez's explanations of why he had not identified appellant until the preliminary hearing. The trial court considered the circumstances under which Lopez was attacked and concluded Lopez did not have ample opportunity to see his assailant so he could later identify him. The court concluded Lopez's in-court identification was highly suspect, but not because of the procedures used by the police. The trial court surmised Lopez's in-court identification was based solely on the fact that both suspects were seated at counsel table and Lopez knew Casares was one of the assailants. The court further concluded that its doubts about Lopez's veracity and its suspicions regarding the in-court identification were not sufficient grounds to suppress the identification evidence. Because the issue revolved around Lopez's credibility, the court ruled that all circumstances surrounding the identification should be submitted to the jury.

As we read the court's ruling, the court did not expressly determine whether the identification procedures used here were impermissibly suggestive. Instead, the court seems to have moved directly to the question of

whether the in-court identification of appellant resulted from such procedures. The court concluded it did not.

■ Appellant's complaint about Morales's conduct and statements when he showed Lopez the "mug" lineup in the hospital is groundless. Telling a witness suspects are in custody or questioning a witness further if the officer believes the witness actually recognized someone in the lineup is not impermissible. (*People* v. *Wimberly, supra,* 5 Cal.App.4th at p. 789; *People* v. *Perkins, supra,* 184 Cal.App.3d at p. 590.) The officer did nothing improper when he showed the "mug" lineup to Lopez in the hospital.

The more difficult question involves the single photograph of appellant later shown to Lopez. Numerous cases have condemned the use of a single photo identification procedure. (See *Stovall* v. *Denno* (1967) 388 U.S. 293, 302 [18 L.Ed.2d 1199, 1206-1207, 87 S.Ct. 1967]; *Foster* v. *California* (1969) 394 U.S. 440, 443 [22 L.Ed.2d 402, 406-407, 89 S.Ct. 1127]; *In re Hill* (1969) 71 Cal.2d 997, 1004 [80 Cal.Rptr. 537, 458 P.2d 449]; *People* v. *Hernandez* (1988) 204 Cal.App.3d 639, 653 [251 Cal.Rptr. 393]; *People* v. *Pervoe* (1984) 161 Cal.App.3d 342, 358-359 [207 Cal.Rptr. 622]; *Marsden* v. *Moore* (11th Cir. 1988) 847 F.2d 1536; *United States* v. *Cueto* (5th Cir. 1980) 611 F.2d 1056.)

■ Although the trial court did not make an express finding on whether the pretrial photographic procedures were suggestive, it is clear from the record that they were. After Lopez had failed to identify appellant from the photo lineup, the deputy district attorney showed him a single photo of Contreras two days before the preliminary hearing and asked if Lopez could identify him as his assailant. Lopez had been told there were two individuals in custody and knew Casares was one of them—he knew the police wanted Lopez to identify the other. The picture was a clear photo of appellant. The procedure could only suggest to Lopez that the police believed Contreras to be the other assailant.

■ Merely concluding that the pretrial procedures were suggestive does not end the analysis, however. In *Manson* v. *Brathwaite* (1977) 432 U.S. 98 [53 L.Ed.2d 140, 97 S.Ct. 2243], the United States Supreme Court, weighing various interests involved in such cases, rejected a strict exclusionary rule whenever an identification follows suggestive photographic procedures. The court stated that the proper standard "is that of fairness as required by the Due Process Clause of the Fourteenth Amendment." (*Id.* at p. 113 [53 L.Ed.2d at p. 153].)

Accordingly, numerous cases have found no due process violation from the admission of evidence of identifications made either at the time of or

subsequent to a single photo showup. (See *Simmons* v. *United States, supra,* 390 U.S. at p. 384 [19 L.Ed.2d at p. 384]; *Stovall* v. *Denno, supra,* 388 U.S. at p. 302 [18 L.Ed.2d at pp. 1206-1207; *People* v. *Hernandez, supra,* 204 Cal.App.3d at p. 653; *People* v. *Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009 [242 Cal.Rptr. 269]; *People* v. *Pervoe, supra,* 161 Cal.App.3d at pp. 358-359; *People* v. *Edwards* (1981) 126 Cal.App.3d 447, 455 [178 Cal.Rptr. 876]; *Wilson* v. *Superior Court* (1977) 70 Cal.App.3d 751, 757 [139 Cal.Rptr. 61]; *People* v. *Allen* (1974) 41 Cal.App.3d 196, 204 [115 Cal.Rptr. 839]; *People* v. *Greene* (1973) 34 Cal.App.3d 622, 642-643 [110 Cal.Rptr. 160].) As this court has noted, no identification procedure can be completely insulated from suggestion. (*People* v. *Perkins, supra,* 184 Cal.App.3d at p. 590.)

The classic statement applicable to such cases was made by the United States Supreme Court in *Simmons* v. *United States, supra,* 390 U.S. 377: ". . . [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (*Id.* at p. 384 [19 L.Ed.2d at p. 1253].)

The high court's language ("as to give rise to") suggests that due process interests are affected only when there is a causal relationship between the photographic procedure and the witness's identification of the defendant. This is most commonly illustrated by cases in which the trial court is convinced that the witness's identification is based on an independent recollection of the assailant, and allows admission of the identification. For instance, in *People* v. *Edwards, supra,* 126 Cal.App.3d 447, the victim first saw the defendant through a window at a hospital shortly after she was raped. The defendant was the only person in the room other than a deputy sheriff. Later she saw a single photograph of the defendant on a detective's desk. The trial court allowed her in-court identification because she had ample opportunity to identify her assailant during the assault and was unequivocal when she identified the defendant at trial. The conviction was upheld on appeal.

In *People* v. *Greene, supra,* 34 Cal.App.3d 622, the victim identified the defendant as the assailant when shown a single photograph of the defendant. The identification was admitted because the trial court found the victim had an opportunity to view the assailant during the offense and because she had given a consistent description of the assailant before seeing the photograph. Again, the judgment of conviction was affirmed.

In *People* v. *Hernandez, supra,* 204 Cal.App.3d 639, the witness's identification of the defendant as the burglar was admitted even though the witness had been shown a single photograph of the defendant. The police did not initiate the identification process by showing a single photograph of the defendant. The witness had previously, after viewing a photographic lineup, said that defendant looked more like the burglar than anyone else. Even after seeing the single photograph, the witness was unable to give a positive identification. Given these facts, this court found showing the single photograph did not affect the witness's tentative identification of the defendant at trial.

 The mere fact that a witness is unable to identify a defendant from photographs shown him does not render a subsequent in-court identification inadmissible. (See *People* v. *Prado* (1982) 130 Cal.App.3d 669, 674 [182 Cal.Rptr. 129]; *People* v. *Dominick* (1986) 182 Cal.App.3d 1174, 1197 [227 Cal.Rptr. 849].)

 This case is somewhat unique because the trial court expressly found the in-court identification resulted neither from the pretrial photographic procedures nor from Lopez's independent recollection. Instead, the court concluded Lopez was untruthful in his testimony concerning his observations of the assailant and his ability to recognize him, and that the identification was based on Lopez's seeing appellant in court with Casares, whom he had already identified. The court rejected appellant's claim that the in-court identification was a product of the impermissibly suggestive pretrial photographic procedures. Recognizing that its own findings rendered the proffered testimony "unreliable," the trial court went on to explain: "This Court's opinion of Lopez' veracity does not allow a granting of Contreras' motion to suppress. Lopez' veracity about his undisclosed identification of Contreras [*sic*] photo and his in-court identification goes to the weight of the identification and not to its admissibility. Contreras' motion to suppress Lopez' undisclosed photo identification and in-court identification is denied. The question of Lopez' truthfulness about the identification of Contreras should be fully explored before the jury . . . ."

We know of no similar case in which the trial court concluded the identification evidence was unreliable for a reason other than the suggestive pretrial procedures. Appellant, however, has not shown us why our approach to the issue here should be different from those in which the trial court finds the identification was based on the witness's independent recollection. In either type of case, the crucial finding is that the identification did not result from the photographic procedures. If the trial court has made findings of fact supported by substantial evidence, we are bound to accept those

findings. (*People* v. *Cheatham* (1971) 21 Cal.App.3d 675, 679 [98 Cal.Rptr. 670].)

The trial court carefully considered Lopez's testimony and concluded Lopez was lying about his ability to identify appellant. The court's finding is supported by the record. Lopez had been anything but forthright with law enforcement from the outset. At the preliminary hearing, Lopez testified he did not recognize appellant in either the photographic showup or when shown the single photograph of defendant because the photographs were dark. As the trial court noted, the photograph of Casares was just as dark and Lopez had no trouble identifying him. Also, the single photograph of appellant was clear and a good likeness of Contreras. Moreover, Lopez failed to identify appellant after his alleged motive for lying to police (the desire to "get revenge" himself) was removed, i.e., after being told two suspects were in custody.

While other reasonable inferences might have been drawn from the evidence presented at the suppression hearing, we cannot say that the inferences drawn by the trial court are unreasonable.

Appellant cites a number of federal cases involving claims of due process violations based on showing a witness a single photograph of the defendant. In several of those cases, however, the appellate court concluded that even though the procedure was impermissibly suggestive, it did not, under the totality of circumstances, create a substantial risk of misidentification at trial. (See *Dobbs* v. *Kemp* (11th Cir. 1986) 790 F.2d 1499; *O'Brien* v. *Wainwright* (11th Cir. 1984) 738 F.2d 1139; *Hudson* v. *Blackburn* (5th Cir. 1979) 601 F.2d 785.) In other cases a due process violation was found, but because each case turns on its own facts, they offer little guidance here. (See *Marsden* v. *Moore, supra,* 847 F.2d 1536; *United States* v. *Cueto, supra,* 611 F.2d 1056.)

██ We do not see any unfairness, certainly none offending constitutional standards, in the court's decision to allow the identification evidence. The jury was made fully aware of the circumstances leading to Lopez's ultimate, in-court identification. The jury heard that Lopez was unable to identify Contreras until seeing him at the preliminary hearing, even though shown pictures of him earlier. The jury saw the photograph of Contreras and could draw its own conclusions about its clarity. It could decide whether Lopez should have been able to identify appellant if he indeed had been the assailant. In addition, the jury had the benefit of testimony from appellant's

expert witness, who opined that showing the photographs to Lopez before the preliminary hearing created a substantial likelihood of misidentification.[1]

The jury was properly instructed with CALJIC No. 2.92 identifying various factors bearing upon the accuracy of an eyewitness's identification of the defendant. Among the factors mentioned by the court were "[w]hether the witness was able to identify the alleged perpetrator in a photographic or physical lineup" and "[w]hether the witness' identification is in fact the product of his own recollection." During argument, appellant's counsel stressed the facts concerning the identification and argued strenuously that it was not believable.

In short, when the court concluded that Lopez's identification of Contreras was not the result of having been shown the photographs, the identification issue was largely one of credibility. The credibility of a witness's testimony is a question for the jury at trial, not an issue to be resolved in pretrial motions. We conclude that appellant has not shown that admission of the identification evidence resulted in unfairness "as a demonstrable reality." (*People* v. *Perkins, supra,* 184 Cal.App.3d at p. 589.)

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Judgment affirmed.

Dibiaso, Acting P. J., and Harris, J., concurred.

A petition for a rehearing was denied August 25, 1993, and appellant's petition for review by the Supreme Court was denied November 10, 1993.

---

[1]This evidence was not before the court at the suppression hearing.
*See footnote, *ante*, page 813.